UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
_____

In re

      CANANDAIGUA LAND         Bankruptcy Case No. 11-20888-PRW
      DEVELOPMENT, LLC,         Chapter 7


         Debtor.
_____

      CANANDAIGUA LAND
      DEVELOPMENT, LLC,

         Plaintiff

         vs.                      Adversary Proceeding No. 11-02037-PRW

      COUNTY OF ONTARIO, and
      DALE C. STELL, and
      JOSEPH E. MAY,

         Defendants.

_____


**DECISION AND ORDER**
**GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**


PAUL R. WARREN, United States Bankruptcy Judge


      Canandaigua Land Development, LLC ("Canandaigua") commenced this adversary

proceeding seeking to set aside the transfer of a sizeable parcel of undeveloped real property to

the County of Ontario ("County"). Title to the parcel was transferred to the County as a result of

an *in rem* tax foreclosure following Canandaigua's failure to pay real estate taxes. Canandaigua

claims that the transfer is avoidable as a constructively fraudulent conveyance under 11 U.S.C.

§ 548(a)(1)(B). Presently before the Court are competing motions for summary judgment by Canandaigua and the County.[1]

# I.

## JURISDICTION

The Court has jurisdiction of this case pursuant to 28 U.S.C. §§ 157(a), 157(b)(1), and 1334(b). This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(H). This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Rule 7052 of the Federal Rules of Bankruptcy Procedure ("FRBP").[2]

# II.

## QUESTION PRESENTED

The question presented for determination is whether an *in rem* tax foreclosure conducted by the County—in full compliance with Article 11 of the New York Real Property Tax Law— can be set aside by the trustee as a constructively fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B). This precise issue has not previously been answered by either Division of the

---

[1] Defendants, Dale Stell ("Stell") and Joseph May ("May"), are nominal defendants by virtue of their status as winning bidder and back-up bidder at the auction sale conducted by the County some months after the *in rem* tax foreclosure.

[2] The County has not objected to this Court's issuance of a final order in this proceeding. However, because the action includes a potential "*Stern* claim," the Court makes its findings of fact and conclusions of law, in the alternative to issuing its final order, for *de novo* review by the District Court in the event of a constitutional challenge on appeal.

2

Bankruptcy Court or the District Court for the Western District of New York.[3] The Court has permitted the parties considerable latitude in making submissions to fully brief and argue the points and authorities to be considered in deciding this issue. The parties have advised the Court that submissions have been concluded and that no further argument is required. The issue is now ripe for determination.

## III.

## SUBMISSIONS BY THE PARTIES

Canandaigua filed a Motion for Summary Judgment on June 29, 2012 and a supporting Memorandum of Law ("Motion") (ECF AP Nos. 55 & 57).[4] The County filed a Cross-Motion for Summary Judgment seeking dismissal of the complaint on August 7, 2012 ("Cross-Motion") (ECF AP No. 64). Canandaigua filed a Reply Memorandum of Law on November 21, 2012 (ECF AP No. 73). The County filed a Reply on December 3, 2012 (ECF AP No. 74). The County filed a Further Submission in Support of the Cross-Motion on December 21, 2012 (ECF AP No. 77). The County of Wayne, as an interested party by virtue of being the defendant in an

---

[3] Chief Judge Bucki was presented with the issue by the Chapter 13 debtor in *Johnson v. County of Chautauqua*, 449 B.R. 7 (Bankr. W.D.N.Y. 2011), *reconsideration denied*. Chief Judge Bucki granted the County's motion for summary judgment dismissing the complaint based upon the limiting language of New York CPLR § 5206(a), applicable in cases filed prior to January 21, 2011. *See id.* at 12. The issue has been addressed by a number of bankruptcy courts both in this Circuit and in other Circuits where state law permits *in rem* or "strict" tax foreclosures to be utilized by local governmental units. The issue has also been addressed on appeal by the District Court for the Northern District of New York and by a few Circuit Courts of Appeal. *See* discussion *infra* Part VI.B.2.

[4] References to the docket for the adversary proceeding are identified as "ECF AP" and references to the docket in the main bankruptcy case are identified as "ECF BK."

3

adversary proceeding involving the same legal issue, filed a Supplemental Submission in Support of the Cross-Motion on January 4, 2013 (ECF AP No. 78). On January 17, 2013, Canandaigua filed a Reply to the County's Further Submission and Affidavit in Opposition to the Motion to Dismiss and a Supplemental Memorandum of Law (ECF AP Nos. 84 & 86). Canandaigua also filed an Affidavit of John K. McAndrew, Esq. ("McAndrew") on behalf of Woods Oviatt Gilman, LLP ("Woods-Oviatt"), in support of Canandaigua's assertion that the law firm was a creditor with a valid claim against Canandaigua on the last date to redeem the parcel from foreclosure (ECF AP No. 85). On February 8, 2013, the County filed a Second Further Submission and a Second Supplemental Memorandum of Law (ECF AP Nos. 89 & 90).

On March 4, 2013, the Court entered an Order Converting the Chapter 11 case to a Chapter 7 case for cause, pursuant to 11 U.S.C. § 1112(b), on the motion of the County (ECF AP Nos. 93 & 64). Canandaigua appealed the Court's Order of Conversion, but subsequently withdrew that appeal. On April 12, 2013, the Chapter 7 Trustee submitted a letter to the Court, opposing the County's Cross-Motion and joining Canandaigua's Motion for summary judgment (ECF AP No. 109). At a hearing held on April 18, 2013, the Chapter 7 Trustee indicated his consent to Canandaigua's continued prosecution of the adversary proceeding on behalf of the Estate[5] (ECF AP No. 109). The Court held a series of hearings with the parties following the conversion to Chapter 7, to narrow the issues, as is reflected by the docket. On June 6, 2014, the

_____

[5] 11 U.S.C. § 323(b) and Rule 6009 FRBP vested the Chapter 7 Trustee with standing to prosecute the adversary proceeding, following the conversion to Chapter 7. Prior to conversion, the Chapter 11 debtor in possession had standing to bring the action pursuant to 11 U.S.C. § 1107(a). Given the considerable litigation activity in this adversary proceeding prior to conversion of the Chapter 11 case, the Court approved the Trustee's request to allow counsel to Canandaigua to continue to pursue the action on behalf of the Chapter 7 Trustee for the benefit of the Estate.

4

County filed its Reply on Behalf of the County of Ontario, addressing the issue of whether the 2011 real property taxes were a liability of Canandaigua as of the date of commencement of the bankruptcy case (ECF AP No. 128). The County filed a further Submission Regarding Claim of Woods Oviatt Gilman, LLP and Measure of Damages on July 28, 2014 (ECF AP No. 131).

After careful consideration of Canandaigua's Motion for summary judgment and the County's Cross-Motion for summary judgment, together with the various Memoranda of Law, affidavits, and exhibits, as well as the arguments of counsel at the series of hearings held with respect to the motions, the Court makes the following findings of fact and conclusions of law, by which the Court determines and orders that: (1) Canandaigua's Motion for summary judgment on its First Cause of Action, on behalf of the Chapter 7 Trustee, on the issue of liability for a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B), is **GRANTED**; (2) Canandaigua's Motion for summary judgment on its Second Cause of Action, on behalf of the Chapter 7 Trustee, to recover the Property for the benefit of the Estate, pursuant to 11 U.S.C. § 550(a), is **GRANTED**; (3) The County's Cross-Motion for summary judgment dismissing the complaint is **DENIED**.

## IV.

## FINDINGS OF FACT

The relevant facts are not in dispute. The appropriate conclusions to be reached when applying the law to those facts are, of course, vigorously disputed by the parties.

Canandaigua is a limited liability company that owned approximately fifty acres of unimproved real estate in Canandaigua, New York ("Property") (ECF AP No. 55-4 at ¶ 3). Canandaigua filed a petition commencing a Chapter 11 case on May 4, 2011 (ECF BK No. 1).

5

Gary S. Kuskin ("Kuskin") is listed as the Managing Member on the Petition (ECF BK No. 1). Kuskin, along with his wife and three children, are the owners of the company (ECF AP No. 55-4 at ¶ 4).

On Schedule B, Canandaigua listed the Property's market value at the time of filing as $300,000 (ECF BK No. 34). According to the County's tax bills, the assessed value at the time of filing was $425,000 (ECF BK No. 34). In amended schedules filed shortly after the Chapter 11 case was commenced, Canandaigua indicated that it had no ownership interest in real property because the Property had been the subject of a pre-petition *in rem* tax foreclosure (ECF BK No. 34, Amended Schedule A). The only asset listed by Canandaigua was a potential claim against the County to recover the foreclosed Property (ECF BK No. 34, Amended Schedule B).[6] With the exception of its claim against the County, Canandaigua owned no assets when it filed for Chapter 11 protection (ECF BK No. 34).

A number of months prior to the filing of the Chapter 11 bankruptcy case, the County had commenced an *in rem* tax foreclosure against the Property, pursuant to Article 11 of the New York Real Property Tax Law ("NYRPTL") (ECF AP No. 64-2 at ¶ 6). The tax foreclosure was commenced to collect delinquent real estate taxes for tax years 2009 and 2010 ("Foreclosure") (ECF AP No. 55-4 at ¶ 7). The delinquent pre-petition real property taxes totaled $16,594.99 (*Id.*). On October 4, 2010, the County sent Canandaigua notice of the Foreclosure proceeding,

---

[6] Days after the bankruptcy was filed, a motion was filed by the County requesting an Order determining that the Property was "not property of the bankruptcy estate" under 11 U.S.C. § 541 (ECF BK No. 6). Judge Ninfo entered an Order determining that the Property was "not property of the bankruptcy estate, and that the County was not subject to the automatic stay as it related to the Property" (ECF AP No. 22). However, Judge Ninfo granted Canandaigua's Motion for a Preliminary Injunction, effectively enjoining the County from conveying title to the Property during the pendency of this adversary proceeding (*Id.*).

6

by both certified and regular first class mail, to the two addresses it had listed for Canandaigua, as required by § 1125 NYRPTL (ECF BK No. 64 at ¶¶ 6-9).

The notice informed Canandaigua that the last day to redeem the Property by paying the delinquent taxes was January 14, 2011 ("Redemption Date"), and that Canandaigua would be foreclosed of all rights in the Property in the event of the failure to pay all delinquent taxes by the Redemption Date (ECF AP No. 55-4 at ¶ 7; ECF AP No. 64-2 at ¶ 10). Canandaigua failed to redeem the Property by timely paying the delinquent taxes and failed to interpose an answer to the Foreclosure notice (ECF AP No. 64-2 at ¶ 11). On February 18, 2011, a default judgment in favor of the County in the Foreclosure proceeding was entered, awarding possession of and title to the Property to the County, pursuant to § 1136(3) NYRPTL (ECF AP No. 64 at Exhibit "E").

On May 4, 2011, a few hours after Canandaigua filed its petition commencing the Chapter 11 bankruptcy case, the County conducted an auction sale of the Property, pursuant to § 1166 NYRPTL, at which co-defendant Stell made the highest bid of $155,000, plus payment of $12,558.17 for the 2011 property taxes, and co-defendant May made a back-up bid for an undisclosed amount (ECF AP No. 55 at ¶¶ 13-15). A representative of Canandaigua attended the auction and read aloud a statement informing all present of Canandaigua's bankruptcy filing earlier that day (ECF AP No. 55-14 at ¶¶ 8-9 & Exhibit "C").

There is no genuine dispute that the *in rem* tax foreclosure complied with New York State law, that Canandaigua failed to either answer the foreclosure notice or timely redeem the Property (ECF AP No. 55-14 at ¶ 6), or that the total amount owed by Canandaigua for delinquent taxes was $16,594.99 (*Id.* at ¶ 5; ECF AP No. 64-2 at ¶ 7).[7] There is also no genuine

---

[7] Canandaigua denies having received the notices of foreclosure mailed by the County because of a change in property management companies, but does not deny that the notices were mailed to

7

dispute concerning the fact that the Property had a value of at least $300,000 and perhaps as much as $425,000 on the date on which default judgment was granted in the Foreclosure (ECF AP No. 55-4 at ¶ 14; ECF AP No. 136, "Parcel Status Report").  Canandaigua offers evidence as to the value of the Property in the affidavit of Kuskin, which states that the "Property was appraised to have a fair market value of $300,000 as of December 28, 2005" (ECF AP No. 55-4 at ¶ 14).  The Property remained in the same undeveloped condition from the date of the appraisal through the commencement of the Chapter 11 proceeding in 2011.  The Property is "assessed by Defendant County to have a fair market value of $425,000" according to a tax search performed on December 3, 2010 by Stewart Title Insurance Company and attached as an exhibit to Kuskin's affidavit (*Id.* & Exhibit "D").  The County has not disputed Canandaigua's alternative values of $300,000 and $425,000.  In its Parcel Status Report dated September 10, 2014, the County continued to list the assessed value of the Property as $425,000 (ECF AP No. 136, "Parcel Status Report").  Based on evidence in the record and the lack of any dispute between the parties concerning valuation, the Court finds the property's value to be at least $300,000, and as much as $425,000, as of both the Redemption Date and the date on which the default judgment was entered in favor of the county in the Foreclosure action.

In Canandaigua's bankruptcy case, the law firm of Woods-Oviatt filed a proof of claim in the amount of $10,349.89, which was amended down to $9,308.00, and further amended down to

---

addresses formerly used by Canandaigua in connection with its business (ECF AP No. 55-4 at ¶ 8).  Although Canandaigua's papers do not affirmatively admit that the *in rem* tax foreclosure complied with New York law, Canandaigua—after extensive briefing on the competing motions for summary judgment—has not challenged the Foreclosure on procedural grounds, nor did it file an action in state court to set aside the Foreclosure on such grounds.  There is ample evidence in the record to show that the County did in fact comply with Article 11 of NYRPTL (*See* ECF AP No. 64 at Exhibits "A," "C," "D," & "E").

$9,100.74 (ECF Claims Register No. 2, Case No. 11-20888). As of the Redemption Date, Woods-Oviatt claims that it was owed $3,808.00 by Canandaigua for legal services performed to that point (ECF AP No. 55-2 at ¶ 7; ECF AP No. 85 & Exhibit "A"). Canandaigua also scheduled debts owed to a number of related entities or individuals totaling an additional $46,904 (ECF BK No. 34). Canandaigua submitted evidence in the form of affidavits, supported by balance sheets, showing that the amount owed for family or related entity advances totaled $50,414, plus an outstanding loan to Kravetz Realty Group in the amount of $31,300 (ECF AP Nos. 55-4 & 55-10).

During the time that this adversary proceeding has been pending, post-petition taxes have accumulated, together with penalties and interest, which, when added to the pre-petition taxes, now total approximately $95,000.00 (ECF AP No. 136). The base amount of taxes is $66,800.20, plus penalties/interest of $19,517.86 (ECF AP No. 136, "Parcel Status Report").

## V.

## ARGUMENTS

Canandaigua's complaint alleges that the County's foreclosure of its tax lien constitutes a constructively fraudulent transfer, avoidable under 11 U.S.C. § 548(a)(1)(B), because Canandaigua (1) was rendered insolvent by the transfer and (2) received less than reasonably equivalent value in exchange for the transfer of the Property to the County.[8] Canandaigua requests an Order avoiding the transfer to the County, cancelling the bids of co-defendants Stell

---

[8] There is no dispute that Canandaigua had an interest in the Property or that the transfer of that interest occurred within two years of the bankruptcy petition, which are the other necessary elements to a cause of action under 11 U.S.C. § 548(a)(1)(B).

9

and May, and awarding Canandaigua, on behalf of the Chapter 7 Trustee, the Property or its value for the benefit of the Chapter 7 Estate, pursuant to 11 U.S.C. § 550(a)(2).

The County denies that the Foreclosure constitutes a constructively fraudulent transfer. First, the County contends that the Foreclosure was conducted lawfully and in compliance with the requirements of Article 11 NYRPTL. Second, the County contends that Canandaigua failed to demonstrate that the transfer rendered it insolvent, as required under 11 U.S.C. § 548(a)(1)(B)(ii)(I), arguing that insolvency is an issue of fact that precludes the granting of summary judgment in favor of Canandaigua (ECF AP No. 64-2 at ¶ 22). Finally, the County argues that its Cross-Motion for summary judgment must be granted, dismissing the adversary proceeding because Canandaigua will be unable to present a confirmable Chapter 11 Plan,[9] or in the alternative, limiting Canandaigua's recovery to money damages in the amount of valid creditor claims—which the County contends equals zero (ECF AP No. 64-2 at ¶ 4).

As to the insolvency prong of its § 548(a)(1)(B) claim, Canandaigua argues that the undisputed facts demonstrate insolvency. Canandaigua points to the fact that it was stripped of its only asset by the *in rem* tax foreclosure and that its debts exceeded its assets as a result. First, Canandaigua asserts that Kuskin family loan advances totaling $50,414 were on its balance sheet prior to the foreclosure date, plus a $31,300 advance from Kravetz Realty Group that remained owing. This assertion is supported by the affidavits of Gary Kuskin and Gina Keyes (ECF AP No. 55-4; ECF AP No. 55-10). Second, Canandaigua argues that the attorney fees owed to Woods-Oviatt totaled $3,808.00 as of the entry of the default judgment in the Foreclosure, on both a contractual and quantum meruit basis. This assertion is buttressed by billing invoices and

_____

[9] This argument is no longer relevant, as the bankruptcy case was converted to Chapter 7 for cause, pursuant to 11 U.S.C. § 1112(b).

10

the affidavit of McAndrew (ECF AP No. 55-2). Third, Canandaigua contends that it is indebted for 2011 County/Town real property taxes that were not part of the County's *in rem* foreclosure action, representing an additional unsecured debt as of the Redemption Date. Canandaigua argues that § 926 NYRPTL provides that the owner of real property is personally liable for real property taxes levied against that property, citing the Office of the State Comptroller Opinion No. 78-558 for the proposition that unpaid town or county taxes are "merged with the town's title upon the execution of the deed and may be canceled . . . only after the conveyance" (ECF AP No. 57 at 12). Because the Ontario County Treasurer failed to execute a deed in favor of the County following the *in rem* tax foreclosure, Canandaigua argues that the 2011 county taxes were an unsecured debt (*Id.* at 13). According to Canandaigua, the Court need only find that it owed debts totaling $1.00 as of the entry of the default judgment in the Foreclosure, to conclude that Canandaigua was rendered insolvent as a result of the involuntary transfer of its only asset (*Id.*).

In response, the County argues that the debts owed by Canandaigua to the Kuskin family members and related LLCs should be treated as equity interests, and not as creditor claims, and that the Kravetz Realty Group claim was no longer carried as a debt on Canandaigua's balance sheet at the end of 2010 (ECF AP No. 64-2 at ¶¶ 23-71). The County also argues that Woods-Oviatt is not a creditor with a claim against Canandaigua, in an effort to prove that Canandaigua owed no "debt" on the date that default judgment was entered in the Foreclosure—to demonstrate that Canandaigua was not rendered insolvent by the transfer of the Property (*Id.* at ¶¶ 72-81). As to the significance of the absence of a deed from the Treasurer, the County contends that the recording of a deed is merely a ministerial act and that "the transfer of possession and title to the property . . . is effectuated by the entry of the default judgment of

11

foreclosure" (*Id.* at ¶ 86) (citing *Wisotzke v. Ontario Cnty.*, 409 B.R. 20, 23 (W.D.N.Y. 2009)(Larimer, J.)). Thus, the County contends that the absence of a recorded deed in favor of the county did not make the delinquent 2011 county taxes an unsecured debt.

Assuming the insolvency element is proven, Canandaigua next argues that it did not receive reasonably equivalent value for the transfer of the Property through the County's *in rem* tax foreclosure. Canandaigua argues that the presumption of "reasonably equivalent value," which the Supreme Court recognized in *BFP v. Resolution Trust Co.*, 511 U.S. 531 (1994) ("*BFP*") for mortgage foreclosures, does not apply to *in rem* tax foreclosures. Canandaigua distinguishes Article 11 NYRPTL—New York's *in rem* tax foreclosure statute—which it argues does not provide for public notice, competitive bidding, or judicial oversight (ECF AP No. 57 at 20-21). Thus, Canandaigua argues the *BFP* presumption of reasonably equivalent value is not available to the County in this case.

In response, the County asserts that Canandaigua's avoidance action cannot be pursued because there is no benefit to creditors with valid claims against Canandaigua, other than the claims of the Kuskin family members who have an equity or ownership interest in Canandaigua (ECF AP No. 64-2 at ¶¶ 94-95). The County contends that Canandaigua is using the Bankruptcy Code to benefit only itself or the Insider Entities (*Id.* at ¶ 101). The County argues that because Canandaigua neglected to pay real estate taxes for two years and did not pursue state law remedies to challenge the County's lawfully conducted *in rem* tax foreclosure proceedings, and because the proceeds from a sale of the Property that would have been generated by the subsequent public auction would have more than adequately paid the claim of Woods-Oviatt, the Court should limit the damages to the amount necessary to pay only valid creditor claims (*Id.* at ¶¶ 102, 105-08).

# VI.

## CONCLUSIONS OF LAW

### A.    Summary Judgment Standard

Canandaigua and the County each move for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP") and Rule 7056 FRBP. Rule 56 FRCP provides that a court may grant summary judgment only if there is "no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The movant bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 *Moore's Federal Practice* § 56.11[1][a] (Matthew Bender 3d ed.). An issue of material fact is genuine where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

Once the moving party has met its initial burden, the burden then shifts to the non-moving party to demonstrate that, as to a material fact, a genuine issue exists. *Id.* at 250. The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Rather, the non-movant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(internal quotation marks omitted). To defeat a motion for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmonvant]." *Anderson*, 477 U.S. at 252. The court must view underlying facts contained

13

in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Anderson*, 477 U.S. at 248-49.

For purposes of the competing motions for summary judgment, the Court finds that there are no genuine issues of material fact.

## B.      <u>Constructive Fraud</u>

Canandaigua's adversary proceeding seeks to have this Court set aside the transfer of the Property, despite the fact that the transfer took place as the result of a lawfully conducted *in rem* tax foreclosure pursuant to Article 11 NYRPTL, on the theory that the transfer is avoidable as a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

To establish the elements of a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B), the trustee must prove that: (1) the debtor had an interest in Property; (2) a transfer of that interest occurred within two years of the filing of the bankruptcy petition; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; and (4) the debtor received less than reasonably equivalent value in exchange for the transfer. 11 U.S.C. § 548(a)(1)(B)(i) & (ii)(I). The party seeking to avoid a transfer as constructively fraudulent bears the burden of establishing these elements by a preponderance of the evidence. *Clinton Cnty. Treasurer v. Wolinsky*, 511 B.R. 34, 38 (N.D.N.Y. 2014)(citing *Schneider v. Barnard*, 508 B.R. 533, 547 (E.D.N.Y. 2014)). The County does not dispute the fact that Canandaigua had an interest in the Property or that the transfer occasioned by the *in rem* tax foreclosure occurred within two years of the Chapter 11 filing. The issues in this adversary

14

proceeding hinge on the third and fourth elements necessary to establish the existence of a constructively fraudulent transfer—whether Canandaigua was insolvent or rendered insolvent as a result of the transfer, and, if so, whether Canandaigua received less than reasonably equivalent value in exchange for the Property transferred to the County through the *in rem* tax foreclosure.

### 1.    Canandaigua Was Rendered Insolvent by the Transfer.

Canandaigua argues that there is no genuine issue as to the fact that, as a result of the transfer of its only asset by the *in rem* tax foreclosure, Canandaigua's liabilities exceeded its assets—rendering Canandaigua insolvent. Canandaigua offers the affidavits of McAndrew, a partner of Woods-Oviatt, and Kuskin, managing agent of Canandaigua, as evidence of the fact that Woods-Oviatt was owed legal fees in the amount of $3,808.00 by Canandaigua on the date of the transfer (ECF AP No. 55-2 at ¶ 7; ECF AP No. 55-4 at ¶ 10(a); ECF AP No. 85).[10]   In addition, Canandaigua argues that the record demonstrates that the Kuskin family members were owed approximately $50,000 by Canandaigua for capital infusions, and Kravetz Realty Group was owed $31,300 for a loan that was not reflected on Canandaigua's 2010 year-end balance sheet (ECF AP No. 55-4 at ¶ 12; ECF AP No. 55-10).

The County devotes a substantial amount of effort to its argument that scheduled debts for members of the Kuskin family or related LLC entities should be disregarded by the Court for purposes of the insolvency determination (ECF AP No. 64-2 at ¶¶ 23-71).   The County further argues that "reclassification" of the Kuskin family claims as equity creates an issue of fact as to

---

[10]   The transfer occurred upon entry of a default judgment of foreclosure on February 18, 2011. *See Johnson*, 449 B.R. at 10 ("[D]efault in a tax foreclosure proceeding will operate to strip the owner of title to the subject property, even when the county has not yet accepted a deed." (citing *Wisotzke v. Ontario Cnty.*, 409 B.R. 20, 23 (W.D.N.Y. 2009)(Larimer, J.)).

the Woods-Oviatt claim sufficient to defeat Canandaigua's Motion for summary judgment (*Id.* at ¶ 138). On the record before the Court, there is evidence—in admissible form—that Woods-Oviatt was owed the sum of $3,808.00 by Canandaigua as of the date on which Canandaigua was divested of its only asset. The record also includes evidence, in admissible form, of the existence of obligations owed to Kuskin family members and Kravetz Realty Group, totaling nearly $80,000 (ECF AP Nos. 55-4 & 55-10). The Court finds that Canandaigua has carried its burden of proving the essential insolvency element, for the reasons that follow.

An action to set aside a fraudulent transfer is pursued for the benefit of creditors—protecting creditors from transfers of assets of a debtor. *See In re Martyak*, 432 B.R. 25, 36 (citing *In re Weisman*, 112 B.R. 138, 140 (Bankr. W.D. Pa. 1990)). In this case, the insolvency analysis turns on whether the sum of Canandaigua's debts is greater than the sum of its property at fair valuation. 11 U.S.C. § 101(32)(A); *see also* 5 *Collier on Bankruptcy* ¶ 548.05[1][a] (16th ed. rev.). There is no dispute that Canandaigua owned a single asset—the Property. There is also no dispute that, following the transfer, the value of Canandaigua's assets was $0.00 (ECF AP No. 55-4 at ¶ 9).

The Court finds that Canandaigua has carried its burden of proving that the Woods-Oviatt claim of $3,808.00 was a liability of Canandaigua on the date of transfer of title to the Property, with evidence in admissible form. The affidavits of Kuskin and McAndrew, with exhibits consisting of billing statements, establish that Canandaigua owed $3,808.00 to Woods-Oviatt for legal fees as of the date on which the Property was transferred (ECF AP No. 55-2; ECF AP No. 55-4; ECF AP No. 85). Both Kuskin and McAndrew are competent to testify based on their personal knowledge of the facts set out in their affidavits, as required by Rule 56(c)(4) FRCP. Taken together, the affidavits establish that Woods-Oviatt rendered legal services to

Canandaigua in connection with the proposed sale of the Property to a third-party and that Woods-Oviatt was to be paid by Canandaigua from the sale proceeds. *Id.* No written retainer agreement was executed regarding the retention. *Id.* Woods-Oviatt sent its periodic billing statements regarding Canandaigua's account to the attention of Kuskin, as that was the only known mailing address for Canandaigua. *Id.* The McAndrew affidavit includes the Woods-Oviatt billing statements of November 4, 2010 and January 7, 2011, in support of the assertion that legal services were performed for Canandaigua (ECF AP No. 55-2 at Exhibit "A"). The billing statements describe services performed in connection with "Canandaigua Land Company, Sale of Parkside Drive Property." *Id.* The billing statements, made and maintained by Woods-Oviatt in the normal course of business, support the allegations contained in the McAndrew affidavit. "There is nothing wrong with self-serving affidavits and declarations, provided they are supported by facts in the record." 11 *Moore's Federal Practice* § 56.94[3] (Matthew Bender 3d. ed). The billing statements show that Woods-Oviatt began providing services for Canandaigua relating to the sale of the Property on October 8, 2010 and that the value of those services was $3,808.00 as of the transfer of the Property to the County on February 18, 2011— the date on which the judgment of Foreclosure was entered in favor of the County.

The County's Cross-Motion for summary judgment argues that the claim of Woods-Oviatt should be disregarded by the Court in its insolvency analysis. The Cross-Motion is supported by the declaration of Jason DiPonzio, Esq., as outside-counsel ("DiPonzio"), as well as the "Section 50-h" deposition transcript of the testimony of Gary Kuskin (ECF AP No. 64-2 & Exhibit "I"). The County asserts that "based upon Mr. Kuskin's testimony . . . [o]nce legal services were provided [by Woods-Oviatt], Mr. Kuskin was billed in his individual capacity" (ECF AP No. 64-2 at ¶ 78). The County further argues "[i]t cannot be said that [Woods-Oviatt]

is a creditor of [Canandaigua] but rather is a creditor of Gary S. Kuskin in his individual capacity, and as the managing corporate officer of the various interrelated Kuskin family entities" (*Id.* at ¶ 80). Thus, the County contends, the claim of Woods-Oviatt should not be considered by the Court in evaluating Canandaigua's financial condition.

Notably, the County does not point to any specific portion of the Kuskin deposition transcript or to any other evidence in the record to support its claim that Woods-Oviatt was not a creditor of Canandaigua. Nor does the County offer any evidence in support of its allegation that Woods-Oviatt billed Mr. Kuskin "in his individual capacity" (*Id.* at ¶ 78). Further, the County's claims are advanced in the form of a declaration—and several supplemental affidavits—of its litigation counsel, Mr. DiPonzio. Counsel's declaration is not based on personal knowledge, does not point to any specific evidence in the record in admissible form, and merely serves to characterize the testimony of Kuskin. Rather than offering affirmative evidence in admissible form, the County points to the absence of a written retainer agreement as evidence that Kuskin was the obligor. It further argues that "there is no indication that [Woods-Oviatt] expected to be paid by [Canandaigua], except from the proceeds of the sale of the Property. Any allegation that [Woods-Oviatt] expected to be paid by [Canandaigua] in any other manner is disingenuous, especially in light of the fact that [Canandaigua] had no income stream from which to pay these bills" (*Id.* at ¶ 79).

In New York, a retainer agreement may be express or implied. McKinney's *New York Judiciary Law* § 474. An attorney-client relationship may be implied from the conduct of the parties. *See Haythe & Curley v. Harkins*, 214 A.D.2d 361, 362 (1st Dep't 1995). Further, an agent of a business entity with the capacity to retain legal services on behalf of that business entity may form an attorney-client relationship on behalf of that business entity. *See In re*

18

*Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 451-52 (S.D.N.Y. 2009); *see also Harkins*, 214 A.D.2d. at 362. An attorney does not represent a shareholder simply by reason of representation of the corporation, unless he affirmatively assumes that duty. *See Kalish v. Lindsay*, 47 A.D.3d 889, 891 (2d Dep't 2008). The payment of an attorney's fee by a third party or the fact that the third party was previously represented by the attorney does not, in and of itself, create an attorney-client relationship. *Moran v. Hurst*, 32 A.D.3d 909, 911-12 (2d Dep't 2006); *see Priest v. Hennessy*, 51 N.Y.2d 62 (N.Y. 1980). Further, billing a principal of a business entity in its individual capacity does not, by itself, create an attorney-client relationship with that individual. *Harkins*, 214 A.D.2d at 362. A court must look to the words and actions of the parties to ascertain the existence of such a relationship. *Moran*, 32 A.D.3d at 910.

Applying the New York law of agency, the Court notes that there has been no issue raised with regard to Kuskin's authority to retain Woods-Oviatt on behalf of Canandaigua to perform legal services. Therefore, without a written retainer, the Court looks to the conduct of the parties to determine whether an attorney-client relationship between Woods-Oviatt and Canandaigua may be implied.

In his deposition, Kuskin discussed the legal services provided by Woods-Oviatt to Canandaigua and the Kuskin family, as well as payment of Canandaigua's operating costs (ECF AP No. 64, Exhibit "I" at 10, 30). Kuskin testified that to cover carrying costs, "there was money advanced by the various owners of the LLC or myself or [my wife]" (*Id.* at 10). Kuskin testified that "[r]eally the only expenses were . . . real estate taxes. It's just vacant land," and that "if there was [sic] additional funds that were required from time to time generally I would put the money in and . . . it was a family affair" (*Id.* at 14). Kuskin acknowledged that there was no retainer agreement between Canandaigua and Woods-Oviatt (*Id.* at 31). Instead, Kuskin testified

19

that the Kuskin family LLC entities and Woods-Oviatt had an ongoing relationship and it was not their "custom for them to acquire [sic] retainers or agreements" (*Id.*). After a change in property management, Kuskin stated that Woods-Oviatt would send the invoices to Kuskin's New Jersey office "so they would get paid" (*Id.* at 12, 32).

Based on the admissible evidence in the record, the Court determines that an attorney-client relationship existed between Woods-Oviatt and Canandaigua. The Woods-Oviatt invoices, Kuskin's affidavit and deposition testimony, and the McAndrew affidavit, taken together, demonstrate that Canandaigua retained Woods-Oviatt for the purpose of representing Canandaigua in its sale of the Property. Mr. Kuskin's periodic advancement of funds to pay the carrying costs on behalf of Canandaigua and his longstanding relationship with Woods-Oviatt in an individual capacity do not alter the Court's finding that the evidence in the record demonstrates that Woods-Oviatt represented Canandaigua regarding the sale of the Property. *See Harkins*, 214 A.D.2d. at 361.

The Court is not persuaded by the County's argument that the Woods-Oviatt claim is "contrived solely for the purposes of this adversary proceeding," and that Kuskin in his individual capacity—or any Kuskin entity—would have the ability to pay the invoice on demand (ECF AP No. 131 at ¶ 15). The County makes much of the fact that the Woods-Oviatt billing invoices incorrectly referred to Canandaigua as "Canandaigua Land Company" (ECF AP No. 131 at ¶ 13). However, the Court views these invoices as indicating that Woods-Oviatt recognized its client—the Property owner—to be a corporation and not an individual.

The Court finds that, based on the evidence in the record, the Woods-Oviatt claim—in the amount of $3,808.00 on the date of transfer—is properly considered as a liability of Canandaigua. The Court further finds that, based on the evidence in the record, the Kuskin

20

family claims and the Kravetz Realty Group claim totaled approximately $80,000 in addition. Because Canandaigua's only asset was transferred as a result of entry of the default judgment of Foreclosure, its liabilities exceeded its assets for purposes of the insolvency test under 11 U.S.C. § 548(a)(1)(B)(ii)(I). Canandaigua was rendered insolvent by the transfer of the Property to the County.

### 2.   Ontario County Is Not Entitled to a Presumption of Reasonably Equivalent Value.

The Court now turns to the fourth element under § 548(a)(1)(B)(i)—whether Canandaigua received "less than a reasonably equivalent value in exchange for such transfer." The term "reasonably equivalent value" is not defined in the Bankruptcy Code.

In *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994), the Supreme Court addressed "reasonably equivalent value" under 11 U.S.C. § 548(a)(1)(B)(i) in the context of a mortgage foreclosure. The Petitioner in *BFP* was a partnership ("Borrower"), which took title to a home subject to $356,250 on a first deed of trust in favor of Imperial Savings Association ("Lender"), and a $200,000 promissory note on a second deed of trust in favor of the previous owners of the home. *Id*. at 533. When the Borrower defaulted in paying on the loan, the Lender entered a notice of default and scheduled a properly-noticed foreclosure sale. *Id.* The home was purchased at the foreclosure sale by a third party for $433,000. *Id.* at 533-34. Three months later, the Borrower filed a Chapter 11 bankruptcy petition and commenced an adversary proceeding, seeking to set aside the mortgage foreclosure as a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B). *Id.* The Borrower alleged that, at the time of the foreclosure sale, the home was worth over $725,000, but was purchased for the price of only $433,000. *Id.*

21

The bankruptcy court granted the Lender's motion to dismiss the complaint, finding that the foreclosure sale had been conducted in compliance with California law, and was not a fraudulent transfer. *Id.* The decision was affirmed by the district court. *Id.* The bankruptcy court also granted a motion for summary judgment in favor of the Lender, which on separate appeal was affirmed by a divided bankruptcy appellate panel. *Id.* The Ninth Circuit consolidated the appeals and affirmed both findings. *Id.*

The Supreme Court granted certiorari to decide the question of whether, pursuant to 11 U.S.C. § 548(a)(1)(B), "the amount of debt satisfied at the foreclosure sale is 'reasonably equivalent' to the worth of the real estate conveyed." *Id.* at 535-36. Delving into the history of decisions that divided the Courts of Appeals on the meaning of "reasonably equivalent value," the Supreme Court contrasted the Ninth Circuit decision that was under review, with the approach adopted by the Fifth Circuit in *Durrett v. Washington National Insurance Co.,* 621 F.2d 201 (1980) and the Seventh Circuit in *In re Bundles,* 856 F.2d 815, 820 (1988). *Id.* at 536. The Court observed that although the Fifth and Seventh Circuits differed in their analyses, both used an approach that adopted "fair market value as the benchmark against which determination of reasonably equivalent value is to be measured." *Id.* at 536-37.

The Supreme Court disagreed with using fair market value as the standard, noting that 11 U.S.C. § 548(a) "seemingly goes out of its way to avoid" the term "fair market value" in defining "reasonably equivalent value." *Id.* at 537. The Court stated that "'[i]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.'" *Id.* (quoting *Chicago v. Envtl. Def. Fund,* 511 U.S. 328, 338 (1994)). Based on the absence of the term "fair market value" in § 548(a), the Supreme Court

22

reasoned that "the language means that fair market value cannot—or at least cannot *always* be the benchmark." *Id.* at 537.

By footnote, the *BFP* Court emphasized that its decision and analysis "covers only mortgage foreclosures of real estate. The considerations bearing upon other foreclosures and forced sales (to satisfy tax liens, for example) *may be* different." *Id.* at 537 n.3 (emphasis added).

Continuing with its analysis of "reasonably equivalent value," the Supreme Court observed that "'fair market value' presumes market conditions that, by definition, simply do not obtain in the context of a forced sale." *Id.* at 538. Instead, the Supreme Court held that the language of 11 U.S.C. § 548 "requires judicial inquiry into whether the foreclosed property was sold for a price that approximated its worth at the time of the sale." *Id.* at 538-39. Because a property sold within the strictures of the foreclosure process "is simply worth less," the Supreme Court reasoned "it is no more realistic to ignore that characteristic of the property (the fact that state foreclosure law permits the mortgagee to sell it at forced sale) than it is to ignore other price-affecting characteristics." *Id.* at 539. The Court concluded that "[a]bsent a clear statutory requirement to the contrary, we must assume the validity of this state-law regulatory background and take due account of its effect." *Id.*

Looking for another "artificially constructed criterion" by which to define reasonably equivalent value, other than fair market value, the Supreme Court next examined the history of foreclosure law and considered "a 'reasonable' or 'fair' forced-sale price." *Id.* at 540. The Court dismissed this notion, explaining that foreclosure law varies "considerably" from state to state. "To specify a federal 'reasonable' foreclosure-sale price is to extend federal bankruptcy law well

beyond the traditional field of fraudulent transfers, into realms of policy where it has not ventured before." *Id.*

The Supreme Court favorably noted the procedural safeguards already built into most states' mortgage foreclosure statutes. The Court observed that within the "diverse networks of judicially and legislatively crafted rules governing the [mortgage] foreclosure process [a]ll States permit judicial foreclosure, conducted under direct judicial oversight . . . [with] half of the States [permitting] . . . foreclosure by exercising a private power or sale provided in the mortgage documents." *Id.* at 541-42. These "[f]oreclosure laws typically require notice to the defaulting borrower, a substantial lead time before the commencement of foreclosure proceedings, publication of a notice of sale, and strict adherence to prescribed bidding rules and auction procedures." *Id.* at 542. Additionally, "[m]any States require that the auction be conducted by a government official, and some forbid the property to be sold for less than a specified fraction of a mandatory presale fair-market-value appraisal." *Id.*

Ultimately, the Supreme Court held that "[w]hen these [state law] procedures have been followed . . . mere inadequacy of the foreclosure sale price is no basis for setting the sale aside, though it may be set aside (*under state foreclosure law*, rather than fraudulent transfer law) if the price is so low as to 'shock the conscience or raise a presumption of fraud or unfairness.'" *Id.* (emphasis in original) (quoting G. Osborne, G. Nelson, & D. Whitman, Real Estate Finance Law 469 (1979)). In coming to this conclusion, the Supreme Court cautioned against overstepping state interests:

> Federal statutes impinging upon important state interests "cannot . . . be construed without regard to the implications of our dual system of government. . . . [W]hen the Federal Government takes over . . . local radiations in the vast network of our national economic enterprise and thereby radically readjusts the balance of state

and national authority, those charged with the duty of legislating [must be] reasonably explicit."

*Id.* at 544 (quoting Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 539-40 (1947)).  Because mortgage foreclosures are "beyond question . . . an essential state interest," the Court declined "to displace traditional state regulation" absent a "clear and manifest" federal statutory directive.  *Id.*  Without such an express directive, "the Bankruptcy Code will be construed to adopt, rather than to displace, pre-existing state law."  *Id.* at 544-45.

With these principles of deference to state law in mind, the Supreme Court held that "reasonably equivalent value," under § 548(a)(1)(B), is the "price in fact *received* at the mortgage foreclosure sale, so long as all the requirements of the State's mortgage foreclosure law have been complied with."  *Id.* at 545 (emphasis added).

In the wake of the Supreme Court's *BFP* decision, lower courts have come to different conclusions regarding the applicability of the so-called "*BFP* presumption of reasonably equivalent value" outside the context of mortgage foreclosures for purposes of 11 U.S.C. § 548(a)(1)(B).  The *BFP* Court's "footnote 3," stating that the holding in *BFP* "covers only mortgage foreclosures of real estate" and noting that other foreclosures—including tax foreclosures—"*may be* different," has spurred significant debate on the issue for two decades. *See id.* at 537 n.3 (emphasis added).

A minority of courts have applied the *BFP* rationale to find that, as a matter of law, the state's sovereign interest in conducting property tax foreclosures under its own state law is significant, and state law should not be displaced by an avoidance action under the Bankruptcy Code absent Congress's "clear and manifest" direction.  *See In re RL Mgmt. Grp., LLC*, No. 13-51849, 2014 Bankr. LEXIS 206, at *17-18 (Bankr. E.D. Mich. Jan. 10, 2014)(citing *BFP,* the bankruptcy court found "no such clear and manifest purpose for which federal bankruptcy law

25

should . . . interfere with property tax foreclosures," in granting a County Treasurer's motion for summary judgment to dismiss the Debtor's avoidance action under 11 U.S.C. § 547(b)); *see also Chase Manhattan Bank v. Pulcini*, 261 B.R. 836, 844 (Bankr. W.D. Pa. 2001)(holding that the *BFP* rationale applied in a § 547 preference action concerning a sheriff's sale because the state's inherent interest in enacting its own foreclosure laws compelled the conclusion that the sheriff's sale should not be avoided by a preference action under the Bankruptcy Code). These cases were decided in the context of a § 547 preference action—which does not utilize the term "reasonably equivalent value." *See* 11 U.S.C. § 547. Nevertheless, these courts relied on the reasoning of *BFP* to find that the Bankruptcy Code must defer to state law where the foreclosure at issue complied with the relevant state foreclosure statute. *See In re RL Mgmt. Grp.*, 2014 Bankr. LEXIS 206, at *17-18; *Pulcini*, 261 B.R. at 844.

By contrast, a majority of courts have taken the view that the state's interest in permitting local governmental units to enforce unpaid property tax obligations through *in rem* or strict tax foreclosures—resulting in the forfeiture of title—although important, "cannot overcome Congress' policy choice that reasonably equivalent value must be obtained [under § 548(a)(1)(B) of the Bankruptcy Code] for a transfer of a debtor's property in the bankruptcy context." *In re Murphy*, 331 B.R. 107, 120 (Bankr. S.D.N.Y. 2005). The majority of courts faced with the issue have declined to extend the Supreme Court's *BFP* "presumption of reasonably equivalent value" to a properly conducted *in rem* tax foreclosure where the procedural safeguards provided by the state's mortgage foreclosure statutes were absent from the state's *in rem* tax foreclosure statutes. *See In re Varquez*, 502 B.R. 186, 193 (Bankr. D.N.J. 2013); *In re Williams*, 473 B.R. 307, 320 (Bankr. ED. Wis. 2012), *aff'd in part and remanded in part*, *City of Milwaukee v. Gillespie*, 487 B.R. 916 (E.D. Wis. 2013); *Murphy*, 331 B.R. at 120; *In re Herkimer Forest Prods. Co. v. Cnty.*

26

*of Clinton*, No. 04-13978, 2005 Bankr. LEXIS 3260, at *13 (Bankr. N.D.N.Y. 2005); *In re Harris*, No. 01-10365, 2003 Bankr. LEXIS 2323, at *15-18 (Bankr. N.D.N.Y. Mar. 11, 2003).

In the Second Circuit, the decisions concerning whether an *in rem* foreclosure can be avoided under 11 U.S.C. § 548(a)(1)(B) because of the absence of "reasonably equivalent value" come predominantly from a series of cases from the Northern District of New York. The courts of the Northern District of New York have examined the *in rem*—or strict—tax foreclosure procedure under Article 11 NYRPTL, as compared to the procedure for a mortgage foreclosure under New York law, in ruling that the *BFP* presumption of reasonably equivalent value does not apply to an *in rem* tax foreclosure conducted under Article 11 NYRPTL.

The first in this line of cases was *In re Harris*, No. 01-10365, 2003 Bankr. LEXIS 2323 (Bankr. N.D.N.Y. Mar. 11, 2003). In considering whether the *BFP* presumption of reasonably equivalent value should apply to a strict tax foreclosure, Chief Bankruptcy Judge Littlefield noted that Title 3 of NYRPTL—the New York state law under which the strict tax foreclosure was brought in the case—involved "little judicial oversight" and had no requirement of competitive bidding or a public sale, unlike state mortgage foreclosure laws. *Id.* at *14-15 (citing *In re Wentworth*, 221 B.R. 316 (Bankr. D. Conn. 1998)). Based on the lack of procedural safeguards in the strict tax foreclosure state statute, the *Harris* court held that "taxing authorities are not entitled to a conclusive presumption that they provided reasonably equivalent value when they took title to a debtor's real property, prepetition, pursuant to a strict tax foreclosure proceeding, despite meeting all of the requirements of [state law]." *Id.* The *Harris* court observed that although a "'forced sale may be legitimate evidence of a property's value, the amount of a tax lien is *no* evidence whatsoever of the property's value.'" *Id.* at *15 (emphasis in original) (quoting *Wentworth*, 221 B.R. at 320).

27

In *In re Herkimer Forest Products Co. v. County of Clinton*, No. 04-13978, 2005 Bankr. LEXIS 3260 (Bankr. N.D.N.Y. 2005), Judge Littlefield again distinguished New York's *in rem* tax foreclosure procedure from its mortgage foreclosure procedure, finding that the *in rem* tax foreclosure does not provide an "allowance for public sale and competitive bidding, [which are] safeguards present in the context of the mortgage foreclosure process in *BFP*." *Id.* at *10 (citing *Harris*, 2003 Bankr. LEXIS 2323, at *15). Finding that Clinton County was, therefore, not entitled to the *BFP* conclusive presumption of reasonably equivalent value, the *Herkimer* court used a "proportional analysis"—to determine whether reasonably equivalent value had been given in exchange for the property transferred, by comparing the tax debt owed to the County, with the scheduled value of the properties in the avoidance action. *Id.* at *13. Where the scheduled value of the properties was "approximately 11 times the debt," the bankruptcy court found that the transfer "[c]learly . . . is not proportional" and was voidable. *Id.* The court noted that the although it was avoiding the transfer occasioned by the County's *in rem* foreclosure— conducted pursuant to Article 11 of the NYRPTL—the rights of the County were "not being displaced, but rather 'impinged.'" *Id.* (citing *Wentworth*, 221 B.R. at 320). The *Herkimer* court reasoned that "the prejudice to the County will be minimal as the County will recover the full amount of its tax lien" through bankruptcy liquidation, while other creditors would benefit from the liquidation, as well. *Id.* at *13-14.

More recently, the District Court for the Northern District of New York affirmed the bankruptcy court's decision avoiding the transfer of property as a result of an *in rem* tax foreclosure under 11 U.S.C. § 548(a)(1)(B) in *Clinton County Treasurer v. Wolinsky*, 511 B.R. 34, 41 (N.D.N.Y. 2014). At the time of the tax foreclosure at issue in *Wolinsky*, the debtor owed $2,406.45 in delinquent real property taxes. The Debtor's property was assessed by the County

for $42,000. Following a judgment of foreclosure, transfer of title to the County, and recording of a deed, the County sold the property at public auction for $25,500. *Id.* at 36.

In addressing the *BFP* presumption of reasonably equivalent value in the context of an *in rem* tax foreclosure under Article 11 NYRPTL, the *Wolinsky* court observed that "several federal courts have specifically refused to so extend *BFP*, in light of the "substantial differences between [state law] mortgage and *in rem* tax foreclosures that distinguish the two and justify their different treatment." *Id.* at 38. That line of cases cited by the *Wolinsky* court included the decision of the Bankruptcy Court for the Southern District of New York in *In re Murphy*, 331 B.R. 107, 118 (Bankr. S.D.N.Y. 2005), which explained that "where competitive bidding is not a component of a tax sale statute, courts have held *BFP* to be inapplicable." *Murphy*, 331 B.R. at 118-19 (determining that New York tax forfeiture law does not provide the protections and competitive bidding that *BFP* required before finding appropriate a presumption of reasonably equivalent value); *see also Cnty. of Clinton v. Warehouse at Van Buren St., Inc.,* 496 B.R. 278, 283 (N.D.N.Y. 2013) (finding the rationale of *BFP* to be inapplicable in the tax foreclosure setting because "the amount of a tax lien is no evidence whatsoever of the property's value" (internal quotation marks omitted)). The District Court in *Wolinsky* affirmed the Bankruptcy Court's conclusion that the New York foreclosure proceeding is a "transfer" within the meaning of § 548(a), and that the Trustee was entitled to avoid the *in rem* tax foreclosure proceeding pursuant to § 548(a)(1)(B). *Id.* at 39.

Similarly, the Bankruptcy Court for the District of New Jersey permitted the debtor to avoid a tax foreclosure as a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B) due to the absence of procedural safeguards under New Jersey's *in rem* real estate tax foreclosure laws—as contrasted to its mortgage foreclosure laws. *In re Varquez*, 502 B.R. 186, 192-933

29

(Bankr. D.N.J. 2013). "Under the New Jersey Tax Sale Law, at the point of the entry of a judgment of foreclosure, there is no sale, forced or otherwise. There is simply the foreclosure of the Debtor's equity of redemption, and the transfer of a fee simple interest in the property to the tax sale certificate holder." *Id.* at 192. Unlike New Jersey's extensive mortgage foreclosure procedures, the court noted, "the acquisition of free and clear title to property by a tax sale certificate holder through the foreclosure of a debtor's equity of redemption involves no sale, no notice requirements to third parties, no auction procedures, and no other exposure to the marketplace in any way." *Id.* Further, the bidding that occurs in the New Jersey tax sale certificate foreclosures is only on the "interest rate to be paid by them by the Debtor in the event that the Debtor redeems the certificate." *Id.* at 193. The *Varquez* court distinguished the case before it from earlier New Jersey cases, as well as the Fifth and Tenth Circuits which had applied the *BFP* presumption to tax foreclosures. *Id.* at 194 (citing and distinguishing *In re Grandote Country Club, Ltd.*, 252 F.3d 1146 (10th Cir. 2001)); *In re T.F. Stone Co.,* 72 F.3d 466 (5th Cir. 1995); *In re McGrath,* 170 B.R. 78 (Bankr. D.N.J. 1994); *In re Plainfield Ave., Inc.*, 72 F. Supp. 2d 482 (D.N.J. 1999), *aff'd*, 213 F.3d 629 (3d Cir. 2000)). As for the Fifth Circuit's *T.F. Stone Co.* decision, the *Varquez* court found that the Fifth Circuit's holding "cannot be applied here because the court in that case was focusing on the consequences of a 'Tax Resale' under Oklahoma law. The procedure for tax resales under Oklahoma law exposes the property to the marketplace, with public advertisement and auction processes." *Id.* at 195. Where these procedural safeguards are not in place—as with New Jersey *in rem* tax sale foreclosures—"the price actually achieved by the transfer, i.e., the satisfaction of tax debt against the property, cannot represent, 'reasonably equivalent value' for the property." *Id.* Indeed, in the *Varquez* case, the taxes owed on the property amounted to $36,000, "and the value of the property [may

30

have been] at least $100,000 greater than the amount of the debt that was satisfied by the transfer." *Id.* at 193.

In *City of Milwaukee v. Gillespie*, 487 B.R. 916 (E.D. Wis. 2013), the District Court for the Eastern District of Wisconsin considered the *BFP* presumption of reasonably equivalent value and found that "a judgment of foreclosure, based solely upon delinquent taxes in a non-sale foreclosure proceeding, does not necessarily provide a property owner 'reasonably equivalent value' for real estate without a public sale offering." *Id.* at 920. The district court noted that "the formula for determining reasonably equivalent value is not a fixed mathematical formula but rather depends on all of the facts of the case." *Id.* In the Seventh Circuit, the *Gillespie* court observed, several factors are relevant to the determination of reasonably equivalent value, including "(1) whether the value of what was transferred is equal to the value of what was received; (2) the fair market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee." *Id.* Because the bankruptcy court had not made separate conclusions of law as to the reasonably equivalent value of all of the Debtor's properties based on these factors, the district court in *Gillespie* remanded the case in part. *Id.*

Although *Gillespie* was remanded to the bankruptcy court to make more complete conclusions of law, Bankruptcy Judge Pepper made several astute observations about the effect on state law of permitting an *in rem*—or strict—tax foreclosure to be set aside as a constructively fraudulent conveyance under § 548(a)(1)(B) of the Bankruptcy Code. *See In re Williams*, 473 B.R. 307 (Bankr. E.D.Wis. 2012), *aff'd in part and remanded in part*, *City of Milwaukee v. Gillespie*, 487 B.R. 916 (E.D. Wis. 2013). The *Williams* court permitted the Debtor to set aside a tax foreclosure as a constructively fraudulent transfer. *Id.* at 320. Judge Pepper noted that "[b]y

31

ruling that a 'strict foreclosure' pursuant to [Wisconsin statute] constitutes a fraudulent transfer, the Court is not invalidating" the statute itself. *Id.* Rather, the bankruptcy court found that "in the context of a bankruptcy proceeding, such a transfer is subject to a § 548 'reasonably equivalent value' analysis." *Id.* Further, "[t]axing authorities in Wisconsin . . . have available several tools which could allow them to continue to use the [statutory] 'strict foreclosure' procedure, while defending against a homeowner/debtor's § 548 claim in the event that the homeowner files for bankruptcy." *Id.*

The Ninth Circuit recently extended the *BFP* presumption of reasonably equivalent value with respect to an adversary proceeding seeking to avoid a California tax foreclosure under 11 U.S.C. § 548(a)(1)(B). *See In re Tracht Gut, LLC*, 503 B.R. 804 (9th Cir. 2014). The Ninth Circuit held that the *BFP* presumption of reasonably equivalent value should apply in an adversary proceeding seeking to avoid the transfer of tax-defaulted real property, where the procedural requirements of California law were met. *Id.* at 818. The Ninth Circuit reasoned that California law provides for "substantial lead time before the commencement of foreclosure proceedings . . . publication of a notice of the sale . . . and strict adherence to prescribed competitive bidding rules and auction procedures as formulated in the state law." *Id.* at 817. In this Court's view, the *Tracht* court's analysis serves to bolster the rationale of *Harris* and its progeny because Article 11 NYRPTL does not provide for the procedural protections listed by the Ninth Circuit—particularly absent from New York's statute is "strict adherence to prescribed competitive bidding rules and auction procedures." *Id.* at 816.

The plain language of § 548(a)(1) of the Bankruptcy Code permits the Trustee to avoid "*any transfer* . . . that was made or incurred within 2 years before the date of filing of the petition . . . [if listed elements are proven]." 11 U.S.C. § 548(a)(1)(emphasis added). "There is simply

no indication that Congress intended to carve out an exception for valid *in rem* tax foreclosure proceedings." *Clinton Cnty. Treasurer v. Wolinsky*, 511 B.R. 34, 38 (N.D.N.Y. 2014). The *Wolinsky* court concluded that, as a matter of law, § 548(a)(1)(B) of the Bankruptcy Code can be utilized to set aside a lawfully conducted *in rem* tax foreclosure, conducted under Article 11 NYRPTL, as a constructively fraudulent transfer—if reasonably equivalent value is not provided (and presuming the other necessary elements are demonstrated). *Id.* at 39.

This Court concurs with the rationale of the *Harris* and *Herkimer Forest Products* court—and the line of cases that followed. This Court holds that taxing authorities are not entitled to a conclusive presumption of having provided reasonably equivalent value when taking title to a debtor's property—pre-petition—as a result of an *in rem* or strict tax foreclosure conducted in full compliance with Article 11 NYRPTL. *See Harris*, 2003 Bankr. LEXIS 2323, at *14-15. The Court agrees with the *Harris* court and its progeny that "§ 548's statutory purpose does not displace the [New York's] scheme of tax foreclosure by forfeiture although it certainly subjects it to the same rules that other creditors, public and private, must face." *Id.* at *15.

### 3. Canandaigua Did Not Receive Reasonably Equivalent Value in Exchange for the Property Transferred.

The undisputed facts in the record are that the delinquent taxes foreclosed by the County totaled $16,594.99. The undisputed facts also demonstrate that the Property had a scheduled value of $300,000, based on a 2005 appraisal, and a tax assessed value of $425,000. The County has offered no evidence of a different value and has not attempted to dispute the evidence of value offered by Canandaigua. As of the date of entry of the default judgment on the tax

33

Foreclosure, which transferred title to the County, the Property was worth 18 times more than the outstanding taxes—using Canandaigua's lower scheduled and appraised value—and 25 times more than the outstanding taxes—using the County's higher tax assessed value. This Court finds, based on facts in the record, that the extinguishment of delinquent taxes of $16,594.99 in exchange for the Property, with a value of between $300,000 and $425,000, was not an exchange for reasonably equivalent value. It is worth noting that the County was offered $155,000 for the Property at an auction conducted some months after the foreclosure, which amount is 9 times more than the delinquent taxes. It is also an undisputed fact that a representative of Canandaigua attended the auction and informed bidders of Canandaigua's existing bankruptcy proceeding, which may have depressed the auction sale price—however, the price offered at the post-foreclosure auction sale, conducted several months after the County took title, is not necessarily relevant in this case.

Therefore, based on the record, the Court finds that (1) Canandaigua was rendered insolvent as a result of the *in rem* tax foreclosure proceeding because its liabilities exceeded its assets, and that (2) Canandaigua received less than reasonably equivalent value by the extinguishment of $16,594.99 in real estate taxes in exchange for the Property with a value of between $300,000 and $425,000. The transfer of the Property is, therefore, avoided and set aside, pursuant to 11 U.S.C. § 548(a)(1)(B).

### C. <u>Damages</u>

Having determined that the transfer of Canandaigua's Property is avoidable under 11 U.S.C. § 548(a)(1)(B), the Court turns to determining the appropriate remedy under 11 U.S.C. § 550. Because the post-foreclosure sale-transfer by the County to Stell was never completed,

the County continues to have legal title to the Property. Therefore, the Trustee may statutorily recover from the County, for the benefit of the Estate, either the Property or value of the Property, as of the date of the transfer, pursuant to 11 U.S.C. § 550(a). "Value" is not defined by the Bankruptcy Code. However, courts generally look to a property's market value at the time of the transfer to determine the amount of recovery pursuant to 11 U.S.C. § 550. *See Wolinsky*, 511 B.R. at 40.

In the DiPonzio Declaration, the County argues that an avoidance action may only be pursued if there is some benefit to creditors and may not be pursued if avoidance would only benefit the equity security holders of Canandaigua (ECF AP No. 64-2 at ¶ 95). The County relies on *In re Murphy*, 331 B.R. 107, 124 (Bankr. S.D.N.Y. 2005), and *In re Unified Commercial Capital, Inc.*, 260 B.R. 343, 352 (Bankr. W.D.N.Y. 2001) in seeking to limit the Trustee's recovery under 11 U.S.C. § 550. The County contends that in attempting to avoid the *in rem* tax foreclosure of the Property, Canandaigua is "essentially . . . only seeking to benefit itself and the Insider entities" (ECF AP No. 64-2 at ¶ 105). The County asserts that Canandaigua's request for relief would "allow [Canandaigua] to circumvent the state law consequences of its neglect in paying its property taxes, and would not serve a 'valid Bankruptcy purpose'" (*Id.* at ¶ 106). In the alternative, the County requests that any damages awarded must be limited to the amount of valid creditor claims (*Id.* at ¶ 2).

In *Wolinsky*, the district court upheld the bankruptcy court's determination that the Trustee may only recover under 11 U.S.C. § 550 the amount realized by the County for the property at auction ($25,500), less the outstanding property taxes and expenses incurred. *Wolinsky*, 511 B.R. at 40. Further, the district court upheld the bankruptcy court's determination that reasonably equivalent value was the amount recovered at public auction and disregarded the

35

$42,000 tax assessment, because no expert testimony was produced to support that amount and the record did not provide any indication of when the assessment was prepared, or by whom. *Id.*

In *Wolinsky*, however, a third-party good faith transferee had purchased the foreclosed property from Clinton County and had acquired title to the property as a result. In this case by contrast, like *Herkimer*, the County did not complete the sale of the Property and transfer of its title. *See Herkimer*, 2005 Bankr. LEXIS 3260, at *4, *13. Further, the Property's $300,000 scheduled value in this case is supported by an appraisal and that value is not contested by the County. This Court finds that in this case, reasonably equivalent value was not provided by the County, by extinguishing a tax liability of $16,594.99 in exchange for Canandaigua's Property worth at least $300,000. Consequently, the return of the Property to the Trustee for liquidation is the best way to ensure that the prejudice to the County and to other classes of creditors will be minimal, as the County will recover the full amount of the tax lien, plus all taxes, penalties and interest accruing during the pendency of this action, while also allowing all other classes of creditors of the bankruptcy estate to benefit from the liquidation of the Property by the Trustee.

Therefore, Canandaigua's Motion for summary judgment on its Second Cause of Action is **GRANTED.** The County shall reconvey the Property to the Chapter 7 Trustee, for orderly liquidation for the benefit of the Bankruptcy Estate.

# VI.   <u>CONCLUSION</u>

Based on the record before the Court and the findings of fact and conclusions of law set forth above, the Court determines that:

1) Canandaigua's Motion for summary judgment on its First Cause of Action, on behalf of the Chapter 7 Trustee, on the issue of liability for a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B), is **GRANTED**;

2) Canandaigua's Motion for summary judgment on its Second Cause of Action, on behalf of the Chapter 7 Trustee, to recover the Property for the benefit of the Estate, pursuant to 11 U.S.C. § 550(a), is **GRANTED**;

3) The County's Cross-Motion for summary judgment dismissing the complaint is **DENIED**;

IT IS SO ORDERED.

DATE: November 5, 2014            _____/s/_____

                             HON. PAUL R. WARREN
                             UNITED STATES BANKRUPTCY JUDGE